Opinion issued December 21, 2012



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00584-CV

———————————

## IN THE INTEREST OF K.N.D., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2011-03002 J

## O P I N I O N

Appellant A.D. appeals the trial court's decree terminating her parental rights to her daughter, K.N.D. In three issues, the mother argues that the evidence is insufficient to support the termination of her parental rights and the appointment of the Texas Department of Family Protective Services as sole managing conservator.

We conclude that the record evidence is legally insufficient to clearly and convincingly establish that the child was removed from her mother "under Chapter 262 for the abuse or neglect of the child," as is required to support termination under the sole ground found by the trial court, section 161.001(1)(O). Accordingly, we reverse and render judgment denying the Department's application for termination of the mother's parental rights. We affirm the remainder of the judgment appointing the Department as sole managing conservator.

## Background

The Department alleged multiple grounds to support its petition seeking termination of A.D.'s parental rights with respect to K.N.D., but the trial court found only one of the predicate grounds contained in section 161.001(1). The decree at issue in this appeal was based solely on findings that the mother failed to comply with a court order after the child had been removed "from the parent under Chapter 262 for the abuse or neglect of the child," TEX. FAMILY CODE § 161.001(1)(O), and that termination would be in the best interest of the child, *id*. § 161.001(2).

A.D. was 37 weeks pregnant when she became involved in an altercation at her apartment complex. She was taken to the hospital by ambulance, and she gave birth to K.N.D. that same day. The following day, a report of "Neglectful

2

Supervision" was referred to Child Protective Services. An investigation ensued, and the following day the Department filed its original petition seeking conservatorship of K.N.D. and termination of the rights of her biological parents. In support of that petition, a CPS investigator summarized the precipitating circumstances by affidavit,[1] in which she stated:

**Facts Necessitating Removal of the Child**

"I have made reasonable efforts under the circumstances to prevent removal of the child but considering the immediate needs to protect the child, removal of the child is necessary."

**Present Referral / Allegation**

On April 29, 2011, the Texas Department of Family and Protective Services (DFPS) (Children's Protective Services) received a referral concerning the Neglectful Supervision of [K.N.D.] by her mother, [A.D.].

It was reported that [A.D.], while 37 weeks pregnant, was involved in a domestic dispute with her two roommates resulting in her falling down and going to the hospital. It was reported that the male roommate put his hand around the female roommate's neck and chased [A.D.] causing her to fall.

Reportedly, the female roommate came to the hospital and informed a nurse that both she and [A.D.] were prostitutes and the male roommate was their pimp. It was reported [A.D.] has history with the agency where her first child, [S.L.A.D.], was placed for adoption because she could not care for the child.

---

[1] The record does not reflect that this affidavit was offered into evidence at trial or judicially noticed by the trial court. For purposes of our review of the sufficiency of the evidence, we assume without deciding that the trial court properly could have considered the affidavit as evidence in support of the termination decree.

**Summary Conclusion**

> Due to concerns for the home environment, including but not limited to the domestic violence in the home, along with [A.D.'s] prior unwillingness to work services with the agency, it is being requested that the Texas Department of Family and Protective Services be named temporary managing conservator of [K.N.D.].

The investigator's affidavit also recounted her investigation, including a face-to-face interview of A.D., who denied the other woman's account and said that the man was her only roommate. She stated that the man had brought the other woman to the apartment "a few weeks" before. According to A.D., she was not involved in any physical altercation, and instead "she felt dizzy and fell down."

The investigator spoke with several other witnesses. A hospital social worker reported that A.D. said that "she was being chased by the male roommate and he stepped on her house shoe which caused her to fall," and that she "was being supported by the female roommate but did not mention in what capacity exactly." According to an employee of the apartment complex, A.D. came to the apartment office and asked how she could have someone removed from her apartment. When A.D. saw the male roommate approaching the office, she left through the side door. The man chased A.D., who fell, prompting the employee to call the police. The male roommate "was escorted off the premises by the police and [A.D.] was taken to the hospital via ambulance."

Finally, the investigator recounted her discussion with the caseworker who was familiar with A.D. due to a separate case involving her first child, S.L.A.D. The caseworker had not been aware of A.D.'s pregnancy. She advised the investigator that A.D. was "a flight risk" with untreated "mental health issues" and that she "will say that she will comply with agency recommendations, but then will not make herself available once it is time to work the services." A.D.'s history with CPS included incidents of "medical neglect" and "neglectful supervision" of S.L.A.D. that had resulted in the very recent termination of A.D.'s parental rights as to that child.

The affidavit concluded by reiterating that the Department sought temporary managing conservatorship of K.N.D. "[d]ue to concerns for the home environment, including but not limited to the domestic violence in the home, along with [A.D.'s] prior unwillingness to work services with the agency." The caseworker also identified the "instability of the home environment and [A.D.] as a caregiver," and stated that "[t]here is a concern for [A.D.] being a flight risk. There is prior CPS history where she has moved before the investigation could be completed and subsequent CPS history has been validated warranting the removal of her other daughter [S.L.A.D.]."

On the day the original petition was filed, the trial court entered its order for protection of a child in an emergency and appointed a guardian ad litem for K.N.D.

5

Fourteen days later the trial court held an adversary hearing and named the Department as temporary managing conservator of K.N.D. The Department ultimately filed its permanency plan and progress report which indicated that K.N.D.'s foster parents were willing to adopt her.

A.D. appeared at trial through her attorney, but she did not attend the proceeding in person. The only live witness at the trial was the CPS caseworker who was familiar with the cases of both S.L.A.D. and K.N.D. The caseworker testified that A.D.'s parental rights with respect to S.L.A.D. were terminated when A.D. relinquished her rights "just before trial started on that case." She also testified that "a lady claiming to be a prostitute" came to the hospital while A.D. was giving birth to K.N.D. and told the investigator and the hospital social worker that A.D. was a prostitute and that they had gotten into a fight with a pimp. She testified that A.D. claimed at the time that she had fought with a roommate and was injured when she fell down. Given the inconsistencies in the stories, the Department investigated further by talking to the apartment manager of the complex where the events occurred. The Department learned that the person A.D. identified as a roommate was not on the lease. The apartment manager saw this man chase A.D. in the parking lot and saw him "stomping on the mother—hitting the mother."

The caseworker testified that the cases of both S.L.A.D. and K.N.D. involved instances of domestic violence. She stated that A.D. did not have stable living conditions or stable employment, which was a concern of the Department in both cases. The caseworker specified that the only proof of A.D.'s employment received by the Department was an "intent to hire letter stating that she would be employed by [a] credit counseling service" and a pay stub reflecting a $40 payment from a home health care service. A.D.'s family service plan required her to maintain stable employment, but the caseworker opined that that A.D. was unable to support K.N.D. The caseworker testified that she believed termination of A.D.'s parental rights to K.N.D. was in the child's best interest and that the Department's plan for K.N.D. was adoption. She testified that "the domestic violence, the fight, whether he was a pimp or a roommate or whatever, endangered the child." She further testified that the Department was concerned that "these behaviors have been going on for a long time, particularly with the men, not having a job, and et cetera, that it could endanger [K.N.D.]."

On cross-examination, the caseworker testified that she spoke to A.D. a month before the hearing. A.D.'s attorney asked, "Did she indicate having any interest in having her child returned?" The caseworker replied, "Not verbally." She testified that A.D. told her "she just became employed working part time at a home health care firm and she's currently residing with a gentleman that she's

known for about six months." She conceded that the child was not injured by A.D.'s actions.

K.N.D.'s attorney ad litem also questioned the caseworker, eliciting testimony that "the violence going on either with the pimp, boyfriend or friend in her apartment" would endanger the child. A.D. had "gone through the family service plan somewhat" but not "sufficiently enough to set aside the potential endangerment of placing this child back with her." The Department intended to place K.N.D. for adoption with her foster family, who had adopted her sibling, S.L.A.D. The child had bonded with her sister and the caretaker, and the foster family was willing to adopt her. The caseworker believed adoption by the foster family was in K.N.D.'s best interest.

The Department also presented several exhibits at trial which were admitted without objection. The trial court admitted into evidence the family service plan and other orders relating to the plan. The Department also offered an order requiring A.D. to remain in the courtroom in order to take a drug test, which, according to the Department's attorney, she "didn't stick around for." The Department also submitted documents regarding a prostitution arrest in Florida showing that A.D. paid the fine.

The Department sought termination of A.D.'s parental rights under subsections 161.001(1)(D), (E), and (O) of the Family Code. The trial court

rendered a decree terminating the mother's parental rights to K.N.D., finding "by clear and convincing evidence" that termination was in the child's best interest and that A.D. "failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of this child . . . pursuant to §161.001(1)(O), Texas Family Code."  The court further found that appointment of a parent as K.N.D.'s managing conservator was not in the child's best interest, and it appointed the Department as the sole managing conservator. The trial court did not make any findings concerning subsections 161.001(1)(D) or (E).

A.D. filed a motion for new trial, arguing that the evidence was legally and factually insufficient to support the trial court's conclusion that A.D. "failed to comply with 161.001(1)(O), Texas Family Code."  A.D. provided an affidavit with her motion for new trial in which she averred, "I am employed, have housing, took my parenting class, submitted myself to [the Mental Health and Mental Retardation Authority] as directed by CPS and they rejected me, and visited with my child."  The trial court denied the motion for new trial, and this appeal followed.

**Analysis**

**I.     Sufficiency of evidence to terminate parental rights**

In her first issue, A.D. argues that the evidence was insufficient to support termination of her parental rights under Family Code section 161.001(1)(O). Among other things, she argues that there was no clear and convincing evidence that K.N.D. was removed as a result of her abuse or neglect of the child.

In order to justify the termination of parental rights pursuant to section 161.001, the Department must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *see also Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982)).

A legal-sufficiency challenge to a termination decree requires us to review all of the evidence to determine whether the evidence viewed in the light most favorable to the finding is such that the factfinder reasonably could have formed a

firm belief or conviction about the truth of the matters as to which the Department bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 266. We "must consider all of the evidence, not just that which favors the verdict." *J.P.B.*, 180 S.W.3d at 573; *J.F.C.*, 96 S.W.3d at 266. We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Section 161.001(1)(O) was the only predicate circumstance found by the trial court in support of its determination to terminate parental rights in this case. That provision applies when:

> the parent has . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(1)(O). A.D. argues that the termination of her parental rights cannot be sustained under section 161.001(1)(O) "in the absence of clear and convincing evidence that K.N.D. was removed from the Mother as a

11

result of the Mother's abuse or neglect of K.N.D." She argues that "[t]here was not evidence of any act or omission that would qualify as abuse or neglect" because "[t]he child was removed at the hospital" and "had not been injured or harmed in any way." She further argues, "There was no evidence of the conditions, circumstances, or surroundings. There was no environment that the child was ever in that could have been neglectful. There was no evidence that [A.D.] ever engaged in any act of abuse towards this child."

Section 161.001(1)(O) specifically references the procedures of Family Code chapter 262, which establishes procedures for a suit by a governmental entity to protect the health and safety of a child. Chapter 262 authorizes the involuntary removal of a child under various circumstances when "there is an immediate danger to the physical health or safety of the child."[2] But the mere occurrence of circumstances justifying removal, such as found by the trial court in this case, do not necessarily imply that the removed child was subjected to abuse or neglect.[3]

---

[2] *See* TEX. FAM. CODE §§ 262.101, 262.102, 262.104 (West 2008).

[3] For example, section 262.004 provides that "[a] law enforcement officer or a juvenile probation officer may take possession of a child without a court order on the voluntary delivery of the child by the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian who is presently entitled to possession of the child." *Id.* § 262.004.

And even if the child was subjected to abuse or neglect, that fact alone does not establish that any particular parent was responsible for such abuse or neglect.[4]

For section 161.001(1)(O) to apply to the removal of a child under chapter 262, the surrounding circumstances must establish that the removal occurred "for the abuse or neglect of the child." The termination of parental rights

---

[4] The dissent emphasizes certain other findings contained in the preliminary "Order for Protection of a Child in an Emergency," entered after the child was removed from the mother. These findings included:

> 3.2.1. there is a continuing danger to the physical health or safety of the child if returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian who was entitled to possession of the child.
>
> or the child has been the victim of sexual abuse on one or more occasions or there is a substantial risk that the child will be the victim of sexual abuse in the future.
>
> 3.2.2. and nature of the emergency and the continuing danger to the welfare of the child make efforts to allow the child to remain with or return to the person entitled to possession of the child impossible or unreasonable.

The findings are boilerplate, considering that the case has never included any suggestion of child sexual abuse. But whatever significance attaches to the findings, they are not sufficient to justify termination under § 161.001(1)(O) because on their face they do not constitute findings that the child was removed from her mother "for abuse or neglect of the child." Even if the child had been abused or neglected, these findings do not attribute responsibility for such abuse or neglect to any particular person. Likewise, the similar findings contained in the later "Temporary Order Following Adversary Hearing" and corresponding to the requirements of § 262.201(b) are not substitutes for evidence that A.D. abused or neglected K.N.D.

pursuant to section 161.001(1)(O) can only be authorized upon clear and convincing evidence of such circumstances. *See, e.g.*, *In re A.A.A.*, 265 S.W.3d 507, 515 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). The sparse record in this case did not include clear and convincing evidence that K.N.D. was removed because she had been abused or neglected by her mother.

Evidence of "endangerment" prior to removal of the child, without more, is not sufficient to satisfy section 161.001(1)(O).[5] The statute specifies and requires "removal . . . for the abuse or neglect of the child." TEX. FAM. CODE ANN. § 161.001(1)(O). There is no evidence to suggest that A.D.'s living arrangements,[6]

---

[5]   The dissent asserts that "DFPS produced clear and convincing evidence of A.D.'s abusive and neglectful behavior that endangered both K.N.D. and her sibling S.L.A.D. and that had not been corrected at the time of the termination trial in compliance with her court-ordered family service plan." But as noted previously, endangerment is not the relevant standard. The dissent also characterizes A.D.'s behavior as being generally "abusive and neglectful," yet there still is no clear and convincing evidence that A.D. abused or neglected K.N.D., as would be necessary to sustain termination under § 161.001(1)(O). *See In re A.A.A.*, 265 S.W.3d 507, 515 (Tex. App.— Houston [1st Dist.] 2008, pet. denied).

[6]   The dissent finds it significant that "at the time K.N.D. was removed from A.D. . . . . A.D. had no stable employment or residence and was unable to provide for K.N.D. in any meaningful way." There is no evidence in the record to suggest that the mother somehow failed to provide the unborn child with food, clothing, or shelter necessary to sustain her life. *Cf.* TEX. FAM. CODE ANN. § 261.001(4)(B)(iii) (defining "neglect" to include "the failure to provide a child with food, clothing, or shelter necessary to sustain the life or health of the child, excluding failure caused primarily by financial inability unless relief services had been offered and refused"). There is also no evidence that the child was removed from the mother for that reason.

14

status as a prostitute,[7] or personal relationships prior to one episode of domestic violence actually exposed K.N.D. to a substantial risk of harm so as to constitute evidence of neglect.[8] Similarly, there is no evidence that A.D. instigated or was in any way personally responsible for the violence visited upon her, such that she culpably exposed the unborn child to a substantial risk of harm. And there is no evidence to suggest that K.N.D. was actually injured so as to support an inference that such injury arose from the mother's abusive conduct.[9] Evidence relating to past abuse or neglect of children other than the removed child is not relevant for

---

[7] The dissent relies on *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ), for the proposition—overly broad in this context—that "[c]riminal conduct on the part of a parent exposes a child to substantial risk of harm." *Avery* is irrelevant to our evaluation of the sufficiency of the evidence to support termination under § 161.001(1)(O). That opinion dealt with the general admissibility of evidence in termination proceedings. *See Avery*, 963 S.W.2d at 553 ("Avery's past criminal record and behavior shows a conscious course of conduct and instability occurring both before and after E.F.'s birth. Most importantly, the evidence shows that Avery has not altered her behavior since the termination of the earlier parent-child relationship. The trial court, therefore, was correct in allowing evidence of her convictions and drug use.").

[8] *Cf.* TEX. FAM. CODE ANN. § 261.001(4)(A) (defining "neglect" to include, among other things, "the leaving of a child in a situation where the child would be exposed to a substantial risk of physical or mental harm").

[9] *Cf.* TEX. FAM. CODE ANN. § 261.001(1)(A), (B), (C), (D), (I) (defining "abuse" to include, among other things, acts or omissions resulting in or otherwise relating to physical, mental, or emotional injury to a child).

15

purposes of section 161.001(1)(O).[10]    In summary, assuming all facts that reasonably could have been found by the trial court in support of its conclusion that removal had occurred "for the abuse or neglect of the child," the fact that A.D. was a prostitute who was physically abused by her pimp on one occasion is legally insufficient to establish that A.D. abused or neglected her unborn child, or that the subsequent removal of the child occurred because of such abuse or neglect.[11]

---

[10]    *See, e.g.*, *In re E.C.R.*, No. 01-11-00791-CV, 2012 WL 897777, at *4 (Tex. App.—Houston [1st Dist.] Mar. 15, 2012, pet. filed); *Mann v. Dep't of Family & Protective Servs.*, No. 01-08-01004-CV, 2009 WL 2961396, at *6–7 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet.).

[11]    In light of the clear-and-convincing standard governing our review of the sufficiency of the evidence, we also note that all of the substantive testimony offered by the CPS caseworker regarding the episode of domestic violence was based on second-hand information documented in the investigator's affidavit. The trial testimony consisted of a series of leading questions, without objections, that included purported statements by the mother's female roommate to the investigator and the hospital social worker. The caseworker testified that the roommate reported that she and A.D. "got into a fight with a pimp" which resulted in A.D. falling down and getting injured. Although the caseworker was not an eyewitness to any of these events, her testimony was essentially consistent with records of the Department which documented that the mother's injury occurred when she fell while being chased by her pimp after he had a physical confrontation with her roommate. The caseworker was also asked about a conversation during which "somebody talked with the apartment manager." The mother's attorney objected to testimony about this conversation on hearsay grounds—although only to the first of two leading questions. The caseworker responded affirmatively to the second leading question that the apartment manager "saw [the pimp roommate] chasing the mother out in the parking lot and stomping on the mother—hitting on mother." This testimony appears to be inconsistent with, or at least is not corroborated by, the investigator's affidavit filed by the Department in support of its petition seeking immediate

16

The fact that A.D. was a prostitute did not constitute per se abuse or neglect of her unborn child, thereby exposing her to the risk of having her parental rights terminated based on any deviation from the detailed orders applicable to her as a consequence of the Department's intervention. The other information that was presented to the trial court did not constitute clear and convincing evidence that the child was removed due to abuse or neglect by her mother. We sustain A.D.'s first issue. Because the evidence was legally insufficient to support the trial court's judgment on the sole ground found under section 161.001(1), we need not separately consider the factual sufficiency of such evidence or A.D.'s second issue, which challenged the sufficiency of the evidence to support the conclusion that termination would be in the best interest of the child.

## II.    Appointment of the Department as sole managing conservator

In her third issue, A.D. argues that the evidence was legally and factually insufficient to support the trial court's appointment of the Department as K.N.D.'s

protection for the child. In that affidavit, the investigator averred that she had spoken "face to face" with the apartment manager who told her that she "saw the male roommate chasing [the mother] in the apartment parking lot. [The apartment manager] told me that she saw [the mother] fall while the male roommate was chasing [her]." The affidavit did not state that the apartment manager saw any "stomping" or "hitting" in the episode. Thus, the caseworker's courtroom testimony, in response to leading questions, went beyond the investigator's written report. Nevertheless, because of the lack of objections, we do not deny all probative value to the caseworker's testimony merely because it is hearsay. *See* Tex. R. Evid. 802.

17

sole managing conservator. In determining issues of conservatorship, the court's primary consideration is always the best interest of the child. TEX. FAM. CODE ANN. § 153.002 (West 2008). The law establishes a rebuttable presumption that it is in a child's best interest for his parents to be named his joint managing conservators. TEX. FAM. CODE ANN. § 153.131(b). However, if the court finds by a preponderance of the evidence that "appointment of the parent . . . would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development," the court may appoint someone other than a parent as sole managing conservator of the child. *See id.* § 105.005, § 153.131(a); *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

To rebut the presumption that a child's best interest is served by appointment of his parents as joint managing conservators, "[t]he non-parent must offer evidence of specific acts or omission of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Whitworth*, 222 S.W.3d at 623. "Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence." *Id.* A.D. did not personally appear at trial to oppose the appointment of the Department and to give evidence to regain custody of her child,

despite receiving notice through her appointed counsel. But the Department introduced evidence sufficient both to rebut the parental presumption in section 153.131 and to establish that appointing it as sole managing conservator was not unreasonable.

The evidence at trial showed that A.D.'s first child was removed from her custody due to medical neglect and neglectful supervision. A.D.'s home environment was unstable. The evidence showed that she lived with two roommates, one of whom chased and assaulted her on the grounds of the apartment complex. There was evidence that A.D. worked as a prostitute and lived with another woman who also did so. The evidence of other employment was extremely limited—an "intent to hire letter stating that she would be employed by credit counseling service" and then a pay stub reflecting that A.D. had been paid $40 by a home health care service. And there was evidence that A.D. relied for financial support on others who had no legal obligation to continue providing that support, such as the female roommate and the man with whom she had lived for six months at the time of trial. The Department also documented concerns about A.D.'s parenting skills, such as the necessity to prompt her to check and change the child's diaper during supervised visits.

Based on this record, the trial court reasonably could have determined that appointment of A.D. as sole managing conservator was not in the best interest of

the child because her lifestyle, instability, and documented deficiency in parenting skills would have significantly impaired K.N.D.'s physical health or emotional development. We hold that the evidence was legally and factually sufficient to support the trial court's implied finding that the parental presumption was rebutted.

A.D.'s issue on appeal broadly challenges the appointment of the Department of sole managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only, not under the heightened standard of review that we employ when reviewing a trial court's termination of parental rights. *J.A.J.*, 243 S.W.3d at 616 (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982)). Therefore, we will reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *Id.* The Department presented evidence that K.N.D. was doing well in her current placement and was bonded to her foster parents and her sister, who had already been adopted by the foster parents. The Department also presented evidence that it intended to keep K.N.D. in this placement with the goal of adoption by the foster parents. In light of this, we cannot conclude that the trial court's decision to appoint the Department as sole managing conservator was arbitrary or unreasonable.

Given this record, we find no abuse of discretion in the trial court's appointment of the Department as sole managing conservator.

## Conclusion

We reverse the portions of the decree related to the termination of A.D.'s parental rights and render judgment denying the petition for termination of A.D.'s parental rights. We affirm the remainder of the judgment.


Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Justice Keyes, dissenting.