Opinion issued August 14, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00584-CV

————————————

## IN THE INTEREST OF K.N.D., A CHILD

———————————————————————————————

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2011-03002 J

———————————————————————————————

## MEMORANDUM OPINION ON REHEARING

Appellant A.D. appealed the trial court's decree terminating her parental rights to her daughter, K.N.D. In three issues, A.D. argued that the evidence was insufficient to support the termination of her parental rights and the appointment of the Texas Department of Family and Protective Services as sole managing conservator.

Following prior precedents of this court, we previously held that the evidence was legally insufficient to establish that the child was removed from her mother "under Chapter 262 for the abuse or neglect of the child," as is required to support termination under the sole ground found by the trial court, section 161.001(1)(O). *In re K.N.D.*, 403 S.W.3d 277, 286 (Tex. App.—Houston [1st Dist.] 2012), *rev'd*, No. 13-0257, 2014 WL 185037 (Tex. Jan. 17, 2014). In light of its subsequent decision in *In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013), the Supreme Court of Texas concluded that "K.N.D. was removed for abuse or neglect under chapter 262 of the Texas Family Code," *In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014), and it remanded the case to this court for further proceedings.

On remand we conclude that the evidence was legally and factually sufficient to support termination of A.D.'s parental rights under section 161.001(O) and to support the trial court's conclusion that termination of A.D.'s parental rights was in the best interest of K.N.D. Accordingly, we affirm.[1]

## Background

A.D. is the mother of S.L.A.D. and K.N.D. Before K.N.D. was born, S.L.A.D. was removed from the mother's care for neglectful supervision and medical neglect. The caseworker who testified in this trial was familiar with both

---

[1]   Appellant A.D. moved for rehearing of our June 12, 2014 opinion and judgment. We deny the motion for rehearing. We withdraw our prior opinion and judgment and issue the following opinion and judgment in their stead.

S.L.A.D. and K.N.D. She testified that domestic violence was an issue in the removal of S.L.A.D., as was the mother's ability to provide and maintain stable living conditions and employment. In addition, the mother failed to maintain contact with the Department after S.L.A.D. was removed from her care. When the child required brain surgery in 2010, the mother could not be located to consent to the operation. Later it was determined that around the same time that S.L.A.D. required surgery, the mother had been arrested in Florida for the misdemeanor offense of prostitution, as punishment for which she paid a fine. Just before the trial regarding termination of her parental rights as to S.L.A.D., A.D. relinquished her rights, placing that child for adoption. S.L.A.D. was later adopted.

Less than two years later, A.D. became pregnant with K.N.D. When she was 37 weeks pregnant, she became involved in an altercation at her apartment complex. According to the caseworker, A.D. claimed that she had fought with a roommate and was injured when she fell down. But she denied involvement in a physical altercation, saying she "felt dizzy and fell down." She told a hospital social worker that she was being chased by the male roommate and he stepped on her house shoe which caused her to fall.

According to an employee of the apartment complex, A.D. came to the apartment office and asked how she could have someone removed from her apartment. When A.D. saw the man approaching the office, she left through the

3

side door. The apartment manager also saw the man, who was not listed as a tenant on the lease, chase A.D. in the parking lot, "stomp" on her, and hit her.

The apartment complex employee called the police, who escorted the man off the premises. A.D. was taken to the hospital by ambulance, and she gave birth to K.N.D. that same day. According to the caseworker, "a lady claiming to be a prostitute" came to the hospital while A.D. was giving birth to K.N.D. and said that A.D. was a prostitute and that they had gotten into a fight with a pimp. A.D. denied this account, but she said that the man had brought the woman to the apartment a few weeks earlier and that the woman was supporting her.

The day after K.N.D. was born, a report of "Neglectful Supervision" was referred to Child Protective Services. An investigation ensued, and the Department filed an original petition seeking conservatorship of K.N.D. and termination of the rights of her biological parents. In support of that petition, a CPS investigator summarized by affidavit the circumstances that precipitated K.N.D.'s removal,[2] explaining the altercation, the information regarding A.D.'s involvement with prostitution, the Department's prior involvement with and A.D.'s relinquishment

---

[2] The record does not reflect that the affidavit of removal was offered into evidence at trial or judicially noticed by the trial court. Nevertheless, because it was evidence that could have been considered by the trial court in support of its finding that K.N.D. was removed based on abuse or neglect, *see In re E.C.R.*, 402 S.W.3d 239, 240–41 (Tex. 2013), we include it for the purpose of providing background and context for this opinion.

of S.L.A.D., and its concerns regarding the home environment, domestic violence, and A.D.'s prior unwillingness to complete services.

In addition, the investigator included information from her discussion with the caseworker who had been involved with S.L.A.D. The caseworker had not been aware of A.D.'s pregnancy. She advised the investigator that A.D. was "a flight risk" with untreated "mental health issues" and that she "will say that she will comply with agency recommendations, but then will not make herself available once it is time to work the services." The affidavit included the Department's concern that A.D. was a "flight risk," saying, "[t]here is prior CPS history where she has moved before the investigation could be completed and subsequent CPS history has been validated warranting the removal of her other daughter [S.L.A.D.]."

On the day the original petition was filed, the trial court entered its order for protection of a child in an emergency and appointed a guardian ad litem for K.N.D. Fourteen days later the trial court held an adversary hearing and named the Department as temporary managing conservator of the child. A.D. attended this hearing in person. In its May 17, 2011 "Temporary Order Following Adversary Hearing," the trial court ordered A.D. to comply with "each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."

Approximately one month later, the Department filed its service plan. It required A.D. to complete certain tasks, including (1) submit to a mental health evaluation, (2) maintain and obtain suitable and legal employment, (3) obtain stable housing, (4) obtain a GED or high school diploma, (5) complete domestic violence counseling, (6) participate in individual counseling, and (7) complete a parenting class.

About a week later, the court held a status hearing and signed two orders. The first order was called "Additional Temporary Orders to Obtain Return of Children." It recited that a hearing was held on June 30, 2011 and that the parents were ordered to take certain actions. However, on the line beside the word "parents" appeared the word "father" and a box which was checked.[3] The word "mother" did not appear on this document. Among other things, the actions required by the order included: (1) complete a psychological examination and follow all recommendations; (2) complete parenting classes; (3) maintain stable housing; (4) maintain stable employment; and (5) complete all services outlined in the Family Plan of Service.

The second order was a "Status Hearing Order." It also recites that a status hearing was held on June 30, 2011. The order advised A.D. that her failure to

---

[3]     Other evidence in the record suggests that the name of the father was not known with certainty, though it was believed to be Bickinson Emile. The father of K.N.D. did not appear in this case.

6

demonstrate that she could provide K.N.D. with a safe environment could result in the termination of her parental rights, and it incorporated the Department's service plan:

> 2.6. The Court finds that [A.D.] "has . . . reviewed and does . . . understand[] the service plan and has . . . been advised that unless she is willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or the child may not be returned to her.
>
> . . . .
>
> 3.1. IT IS ORDERED that, except as specifically modified by this order, the permanency plans and recommendations for the child, set out in the service plans filed with the Court, are approved and adopted by the Court as if set out verbatim in this order.

In addition, after a status hearing in 2012, the court ordered A.D. to remain in the courtroom and submit to drug testing. She did not comply; instead she left after the hearing. The Department ultimately filed its permanency plan and progress report which indicated that K.N.D.'s foster parents, who had adopted S.L.A.D., were willing to adopt her.

A.D. was represented by counsel at trial, but she did not attend the proceeding in person. The only live witness at the trial was the CPS caseworker who was familiar with the cases of both S.L.A.D. and K.N.D. The caseworker testified that A.D.'s parental rights with respect to S.L.A.D. were terminated when she relinquished her rights just before trial was scheduled to begin in that case.

7

She testified about the circumstances that formed the basis for removal of K.N.D. and A.D.'s performance of the actions the court had required her to complete in order to obtain return of K.N.D. The caseworker stated that A.D. never provided proof of stable living conditions or stable employment, which was a concern of the Department in both this case and the prior case involving S.L.A.D. Although A.D. provided the Department with "an intent to hire letter stating that she would be employed by [a] credit counseling service," she was never actually employed by that service. The caseworker testified that the only documentation regarding employment that A.D. had provided was a single pay stub reflecting a $40 payment from a home health care service. The caseworker opined that A.D. was unable to support K.N.D.

The family service plan also required A.D. to submit to a psychiatric evaluation and complete domestic violence counseling and parenting classes. A.D. did submit to a psychiatric evaluation, but MHMRA determined that A.D. did not qualify for services. She also completed a parenting class, as required by the plan of service. However, the caseworker testified that during supervised visits, A.D. required prompting to meet basic needs like diapering and feeding. On the other hand, the caseworker recalled that A.D. attempted to bond with K.N.D. by playing with her.

Although she conceded that K.N.D. was not directly harmed by A.D.'s actions, the caseworker testified that she believed termination of A.D.'s parental rights to K.N.D. was in the child's best interest. She believed that A.D.'s exposure to domestic violence, her relationships with men who engaged in domestic violence, and her long-term lack of employment endangered K.N.D. She also testified that A.D. had failed to comply with "the most important" of the requirements from the family plan of service: securing stable housing and employment and completing domestic violence counseling. The Department's plan for K.N.D. was adoption by the foster family, who had already adopted S.L.A.D. And the caseworker testified that K.N.D. was doing well in that placement and had bonded with her sister and the foster parents. The only special needs that the caseworker noted were seasonal allergies and chronic ear infections.

On cross-examination, the caseworker testified that she spoke to A.D. approximately one month before the hearing. A.D.'s attorney asked, "Did she indicate having any interest in having her child returned?" and the caseworker replied, "Not verbally." A.D. told her that she had recently become employed part-time at a home health care firm and that she was living with a man she had known for six months.

K.N.D.'s attorney ad litem also questioned the caseworker, eliciting testimony that the violence involving the man in her apartment would endanger the

9

child. A.D. had "gone through the family service plan somewhat" but not "sufficiently enough to set aside the potential endangerment of placing this child back with her." The child had bonded with her sister and foster parents, who wished to adopt her. The caseworker believed adoption by the foster family was in K.N.D.'s best interest.

The Department also presented several exhibits at trial which were admitted without objection. The trial court admitted into evidence the family service plan, an order requiring A.D. to remain in the courtroom and submit to drug testing, and records pertaining to A.D.'s criminal history, specifically an arrest in Florida in 2010 for the misdemeanor offense of prostitution, for which she paid a fine, and a dismissed charge of assault-family violence in 2009. The June 30, 2011 Status Hearing Order was not admitted into evidence.

The Department sought termination of A.D.'s parental rights under subsections 161.001(1)(D), (E), and (O) of the Family Code. The trial court rendered a decree terminating the mother's parental rights to K.N.D., finding "by clear and convincing evidence" that termination was in the child's best interest and that A.D. "failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of this child . . . pursuant to §161.001(1)(O), Texas Family Code." The court further found that appointment of a parent as K.N.D.'s managing conservator was not in

10

the child's best interest, and it appointed the Department as the sole managing conservator. The trial court did not make any findings concerning subsections 161.001(1)(D) or (E).

A.D. filed a motion for new trial, arguing that the evidence was legally and factually insufficient to support the trial court's conclusion that A.D. "failed to comply with 161.001(1)(O), Texas Family Code." A.D. provided an affidavit with her motion for new trial in which she averred, "I am employed, have housing, took my parenting class, submitted myself to [the Mental Health and Mental Retardation Authority] as directed by CPS and they rejected me, and visited with my child." Her affidavit provided no detail about her employment or housing situation. The trial court denied the motion for new trial, and A.D. appealed.

After we issued our original opinion in this case, the Supreme Court decided *In re E.C.R.*, holding that the words "abuse or neglect of the child" are "used broadly" in subsection O and include "the harm suffered or the danger faced by other children under the parent's care." 402 S.W.3d at 248. The Supreme Court also reversed this court's earlier opinion, holding that "K.N.D. was removed for abuse or neglect under chapter 262 of the Texas Family Code," *In re K.N.D.*, 424 S.W.3d at 10, and remanding the case to this court for further proceedings.

On remand we consider the arguments that A.D. raised in her brief but which we did not address in our earlier opinion. Specifically, we must determine

11

whether (1) there was legally and factually sufficient evidence of a court order that specifically established the actions necessary for A.D. to obtain return of K.N.D. and (2) the evidence was legally and factually sufficient to support the court's determination that termination of A.D.'s parental rights was in K.N.D.'s best interest.

**Analysis**

### I.      Sufficiency of evidence to terminate parental rights

In her first issue, A.D. argues that the evidence was legally and factually insufficient to support termination of her parental rights under Family Code section 161.001(1)(O) because there was no clear and convincing evidence of a court order that specifically established the actions necessary for her to complete in order to obtain return of K.N.D.

Termination proceedings are strictly scrutinized on appeal. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Clear and convincing evidence must support the decision to terminate parental rights. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002); *see also Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007

(West 2014); *In re J.F.C.*, 96 S.W.3d at 264; *see also Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747, 102 S. Ct. at 1391).

Because of this heightened burden of proof, both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all of the evidence to determine whether the factfinder could have formed a firm belief or conviction about the truth of the matters as to which the Department bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency).

In a legal sufficiency review, we view the evidence in the light most favorable to the finding. *J.P.B.*, 180 S.W.3d at 573; *J.F.C.*, 96 S.W.3d at 266. To do this, we "consider all of the evidence, not just that which favors the verdict," *J.P.B.*, 180 S.W.3d at 573; *J.F.C.*, 96 S.W.3d at 266, and we "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). We also "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *see also Jordan*, 325 S.W.3d at 712–13.

13

In a factual sufficiency review, we consider the entire record, including evidence both supporting and contradicting the finding. *See C.H.*, 89 S.W.3d at 25. "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *J.F.C.*, 96 S.W.3d at 266).

In order to justify the termination of parental rights pursuant to section 161.001, the Department must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West 2014); *C.H.*, 89 S.W.3d at 23. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

The trial court found only one predicate act satisfied in this case: that A.D. "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services . . . as a result of the child's removal from the

parent under Chapter 262 for the abuse or neglect of the child." TEX. FAM. CODE ANN. § 161.001(1)(O). The order need not bear a title stating that it is an order "to obtain return of a child"; rather, it will be sufficient under subsection (O) so long as it directs a parent to perform specific acts and advises the parent that failure to provide a safe environment within a reasonable time period could result in termination of her parental rights. *See J.F.C.*, 96 S.W.3d at 277 & n.74. A trial court may direct a parent to perform specific acts by ordering her to comply with a family service plan created by the Department. *See In re A.A.*, No. 01-13-00542-CV, 2013 WL 6569922, at *9 (Tex. App.—Houston [1st Dist.] Dec. 12, 2013, no pet.) (mem. op.); *In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *2 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.); *In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, *3–4 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Partial or substantial compliance with a court order is not enough to avoid a termination finding under section 161.001(1)(O). *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Finally, we note that in a bench trial, we may "presume the trial court took judicial notice of its record without any request being made and without any announcement that it has done so." *In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—

Houston [14th Dist.] 2013, pet. denied); *see In re S.J.S.*, No. 04-12-00067-CV, 2012 WL 2450817, at \*6 (Tex. App.—San Antonio June 27, 2012, pet. denied) (mem. op.); *Kubosh v. State*, No. 01-05-00401-CV, 2006 WL 2506498, at \*2 (Tex. App.—Houston [1st Dist.] Aug. 31, 2006) (mem. op.) ("[A] trial court may take judicial notice of its own file at any stage of proceedings and is presumed to have done so with or without a request from a party."), *aff'd*, 241 S.W.3d 60 (Tex. Crim. App. 2007).

In this case, A.D. argues that there is no evidence in the record establishing the existence of a court order specifically establishing the actions necessary for A.D. to obtain return of K.N.D. A.D. further argues that "the Status Hearing Order does not reflect that it was served on parents or counsel" and that it was not introduced into evidence. Thus, she argues that it is "not part of the evidence of the case." She further argues that the Family Service Plan is not a court order and that the only court order that specifically sets out tasks is directed toward the father, not A.D.

The clerk's record includes a May 17, 2011 order that required A.D. to comply with "each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The record reflects that A.D. was present for the hearing that occurred on that day. A June 30, 2011 order approved and adopted the Department's service plans "as if set out verbatim in this

16

order" and advised A.D. that "unless she is willing and able to provide the child with a safe environment . . . within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to . . . termination." This order was not introduced into evidence at trial, but we presume the trial court took judicial notice of the existence of this order which it had entered in this case. *See K.F.*, 402 S.W.3d at 504; *S.J.S.*, 2012 WL 2450817, at *6; *Kubosh*, 2006 WL 2506498, at *2. The Department's family service plan was admitted at trial without objection. In addition, the caseworker testified about the contents of the plan and the fact that A.D. partially complied with the plan, including taking parenting classes and visiting with K.N.D. A reasonable factfinder could infer from this that A.D. was aware of the existence and the content of the family service plan.

Considering all of the evidence, we conclude that a reasonable factfinder, in this case the trial court that issued the orders establishing the actions A.D. was required to take in order to obtain return of her child, could have formed a firm belief or conviction that such orders existed. We hold that the evidence of the existence of an order for the purpose of section 161.001(1)(O) is both legally and factually sufficient, and we overrule this issue.[4]

---

[4] A.D. did not challenge the sufficiency of the evidence to show that she failed to comply with the actions specified in that order. Furthermore, we note that the

## II.    Best interest of the child

In her second issue, A.D. argues that the evidence is legally and factually insufficient to support the trial court's determination that termination of her parental rights was in K.N.D.'s best interest.

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In determining whether termination of a mother's parental rights was in the child's best interest, we consider several nonexclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove all of these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See*

---

evidence is undisputed that she only partially completed the actions required by the court's orders.

18

*C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under section 161.001(1) may also be relevant to determining the best interest of the child. *See id.* at 27–28.

Several of the *Holley* factors are neutral in our analysis of this appeal. As to the first *Holley* factor, we note that K.N.D. was only one year old at the time of trial and thus was unable to express any desire for herself. A.D. did not appear at trial and there was no evidence of her plans for K.N.D. or an excuse for her acts and omissions, including her failure to secure stable housing and employment.

Several of the *Holley* factors weigh in favor of the trial court's finding that termination of A.D.'s parental rights was in K.N.D.'s best interest. Chief among these is the element of stability of the home. "Stability is important in a child's emotional and physical development." *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs." *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.).

The evidence at trial was that A.D. had failed to secure stable and legal employment and that she was living with an unidentified man whom she had known for six months. At the time of K.N.D.'s removal, A.D.'s home environment was unstable. The evidence showed that she had lived with two roommates, one of whom chased and assaulted her on the grounds of the apartment complex. There

19

was evidence that A.D. worked as a prostitute and lived with another woman who also did so. The evidence of other employment was extremely limited—an "intent to hire letter stating that she would be employed by credit counseling service" and a pay stub reflecting that A.D. had been paid $40 by a home health care service. And there was evidence that A.D. relied for financial support on others who had no legal obligation to continue providing that support, such as the female roommate and the man with whom she had lived for six months at the time of trial.

While the caseworker identified only seasonal allergies and chronic ear infections as K.N.D.'s special needs, she also testified that A.D. required prompting during supervised visits to meet her child's most basic needs of feeding and diapering.

The evidence at trial showed that A.D.'s first child was removed from her custody due to medical neglect and neglectful supervision, and she eventually relinquished custody of that child. When asked if A.D. expressed an interest in reuniting with K.N.D., the caseworker testified, "Not verbally." A.D. did not personally appear at trial to oppose the appointment of the Department and to give evidence to regain custody of her child, despite receiving notice through her appointed counsel. She offered no explanation for her absence in her motion for new trial. From this, a reasonable factfinder could conclude that the proceeding was not important to her. *See, e.g.*, *In re J.D.S.*, 111 S.W.3d 324, 327 (Tex. App.—

Texarkana 2003, no pet.) ("The absence of a parent at the trial to terminate his or her parental rights is prejudicial to the parent. The parent's absence could leave the fact-finder with the impression that the proceeding is not important to the parent.").

While the *Holley* factors weigh in favor of the court's conclusion that termination of A.D.'s parental rights was in K.N.D.'s best interest, the *Holley* factors are not necessarily the only considerations relevant to determining the best interest of the child. *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2014). In determining whether a parent is willing and able to provide a safe environment, we consider several factors, including (1) the child's age and vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) willingness and ability of the child's family to seek, accept, and complete counseling services and cooperate with agency supervision; (4) the willingness and ability of the child's family to effect positive changes within a reasonable period of time; and (5) whether the child's family demonstrates adequate parenting skills. *Id.* § 263.307(b). Evidence establishing one of the predicate acts under section 161.001(1) also may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 27–28.

Here, all of these factors weigh in favor of the trial court's decision. K.N.D. was one year old at the time of trial and, thus she was entirely dependent on others for her care. There was a history of abusive and assaultive conduct by the men with whom A.D. associated, including a roommate. A.D.'s failure to complete the court-ordered services in this case and her history with the Department in S.L.A.D.'s case show a lack of willingness to seek help and cooperate with agency supervision. Similarly, her failure to secure stable employment and living arrangements during the pendency of this case weigh against A.D.'s ability to effect positive changes within a reasonable period of time. Finally, the caseworker's testimony that A.D. required prompting to meet K.N.D.'s basic needs for food and diapering weigh against a finding that she demonstrated adequate parenting skills.

Considering all of the evidence in light of the *Holley* and statutory factors relevant to a determination of the best interest of the child, we conclude that a reasonable factfinder could have formed a firm belief that termination of A.D.'s parental rights was in K.N.D.'s best interest. We hold that the evidence was legally and factually sufficient to support the trial court's best interest finding, and we overrule this issue.

Having overruled the first two issues, we need not address A.D.'s third issue regarding the appointment of the Department as sole managing conservator.

## Conclusion

We affirm the judgment of the trial court

Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Brown.